IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SALLY KOEN, *Individually and as Independent Executrix of the Estate of Bradley Koen,* SUZANNE KOEN, and WILLIAM KOEN, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:22-CV-209-RP |
| MONSANTO COMPANY, | § § | |
| Defendant. | § § | |

## ORDER

Before the Court are six motions to exclude filed by Defendant Monsanto Company ("Monsanto"), (Dkts. 106, 107, 108, 109, 100, 111), four motions to exclude filed by Plaintiffs Sally Koen, Suzanne Koen, and William Koen ("Plaintiffs"), (Dkts. 113, 114, 115, 116), a motion for summary judgment on Monsanto's affirmative defenses filed by Plaintiffs, (Dkt. 117), a motion for summary judgment filed by Monsanto, (Dkt. 112), and a motion to strike filed by Monsanto, (Dkt. 122). Having considered the parties' briefing, the record, and the relevant law, the Court issues the following order.

## I. BACKGROUND

### A. Koen's Medical Diagnoses and Death

Bradley Koen ("Koen") regularly used Roundup for two decades before being diagnosed with non-Hodgkin lymphoma ("NHL") in 2018 at age 47. (Resp., Dkt. 127, at 1). He was treated with R-CHOP chemotherapy and briefly went into remission before suffering a recurrence in April 2019. (*Id.*). He then received a stem cell transplant and went back into remission, but the cancer recurred again in February 2020. (*Id.*). He then underwent a specialized treatment known as CAR T-cell therapy and went back into remission in June 2020. (*Id.*).

About a year later, Koen began exhibiting symptoms of a dramatic neurological decline, which his doctors initially suspected was Parkinson disease. (*Id.*). He began seeing a neurologist, Dr. Morledge, who prescribed a trial of medications for Parkinson. (Morledge Dep., Dkt. 107-1, at 18). Koen's lack of therapeutic response to these medications prompted Dr. Morledge to rule out Parkinson and consider two plausible alternative diagnoses: Lewy body dementia and paraneoplastic encephalomyelitis ("PEM"). (*Id.*). PEM is a type of paraneoplastic syndrome, which is a condition caused by the body's response to cancer. (*See, e.g.*, Arboe Dep., Dkt. 130-4, at 60). Dr. Morledge did not formally diagnose Koen with PEM at the time because the disease is "extremely difficult to diagnose." (Morledge Dep., Dkt. 107-1, at 24). Dr. Morledge based his PEM suspicion on Koen's "history of [NHL]," as well as "several case studies" linking PEM with NHL "that have been reported in the literature." (*Id.* at 21).

Koen's clinical status continued to deteriorate, and his doctors placed him in a memory care facility. (Resp., Dkt. 129, at 2). He became bedridden and unable to communicate and passed away on April 5, 2023. (*Id.*). His death certificate listed his cause of death as "Drug Induced Parkinson's Disease" due to "Chemotherapy for [NHL]." (*Id.*).

At the time of Koen's death, the trial in this case was set for May 1, 2023, less than one month away. (Order, Dkt. 70). Plaintiffs' counsel immediately hired a forensics company called American Forensics to conduct an autopsy on Koen's body to help determine his cause of death. (Resp., Dkt. 130, at 2). A paralegal for Plaintiffs' counsel sent American Forensics documents in their possession related to Koen's medical care up to 2021. (*Id.* at 8). Plaintiffs' counsel claim that they sent the documents themselves, rather than obtain a medical release from Koen's family to avoid disturbing the family a day after his death but still obtain autopsy results before the impending trial date. (*Id.*; Inquest Report, Dkt. 130-8, at 3).

The autopsy was conducted by Dr. David Arboe, a pathologist, while the autopsy of Koen's brain and nervous system was referred to Dr. Jeremy Deisch, a neuropathologist. (Resp., Dkt. 130, at 2–3). In his preliminary autopsy report, Dr. Arboe noted that Koen died of pneumonia and listed his "history of [NHL]" as a significant condition that may have contributed to his death. (Arboe Prelim. Report, Dkt. 130-2, at 7). Dr. Deisch then issued his report, which diagnosed Koen with "Severe Meningoencephalitis" and noted that Koen's "brain injury is most consistent with [PEM]" which "has been associated with a wide variety of neoplastic conditions, including [NHL]." (Deisch Report, Dkt. 130-7, at 1). Dr. Deisch found no evidence of NHL in Koen's brain. (*Id.*). Having reviewed Dr. Deisch's neuropathological autopsy, Dr. Arboe amended his report to add "Severe Meningoencephalitis" to the list of other significant conditions that may have contributed to Koen's death. (Arboe Report, Dkt. 130-3, at 7).

### B. Procedural Posture

Prior to his death, Koen filed a lawsuit against Monsanto on March 5, 2020. (Compl., Dkt. 1). He alleged that his NHL was caused by exposure to Monsanto's Roundup-branded herbicides ("Roundup"), which contain glyphosate as an active ingredient. (*Id.*). The case was conditionally transferred to the Northern District of California, as a member case in the nationwide multidistrict litigation ("MDL") of claims against Monsanto related to Roundup. (Dkt. 6); *Koen v. Monsanto Co.*, No. 3:20-cv-03074-VC (N.D. Cal. filed May 5, 2020) (member case); *In Re: Roundup Prod. Liab. Litig.*, No. 3:16-md-02741-VC (N.D. Cal. filed Oct. 4, 2016) ("*In Re Roundup*") (lead case). Two years later, on March 3, 2022, the MDL court remanded Koen's action to this Court. (Dkt. 37).

In April 2023, following remand from the MDL, Koen passed away. (Notice, Dkt. 76). After his death, Koen was substituted by his wife, Sally Koen[1]; his mother, Suzanne Koen; and his father, William Koen, as Plaintiffs in this case. (Am. Compl., Dkt. 86). The Court vacated its trial setting

---

[1] Sally Koen also sues as Independent Executrix of the Estate of Bradley Koen. (Am. Compl., Dkt. 86).

and, by joint stipulation, allowed the parties to seek discovery on Koen's end-of-life medical condition. (Dkts. 98, 102). Plaintiffs designated Dr. Morledge, Koen's former neurologist, and Dr. Arboe and Dr. Deisch, who performed Koen's autopsies, as non-retained expert witnesses. (Mots. Exclude, Dkts. 107, 108, 109). They also designated a pathologist, Dr. Kyle Shaw, and an epidemiologist, Dr. Michael Freeman, as retained expert witnesses. (Mots. Exclude, Dkts. 110, 111). Plaintiffs separately designated an economist, Dr. Stan Smith, as a retained expert witness on damages. (Dkt. 106). The case is currently set for trial on July 15, 2024. (Dkt. 102).

Monsanto moves to exclude all six of Plaintiffs' expert witnesses. As to Dr. Smith, the damages expert, Monsanto argues that his economic testimony is unreliable and impermissible. (Mot. Exclude, Dkt. 106). As to the non-retained expert witnesses, Monsanto moves to exclude their testimony on the basis that they cannot testify to matters beyond their personal knowledge and should therefore have been designated as retained experts. (Mots. Exclude, Dkts. 107, 108, 109). Finally, as to Dr. Shaw and Dr. Freeman, Monsanto moves to exclude their testimony on the basis that they are insufficiently qualified and do not meet the standard for expert testimony under Federal Rule of Evidence 702. (Mots. Exclude, Dkts. 110, 111). Finally, Monsanto moves for partial summary judgment on Plaintiffs' wrongful death claims, alleging that Plaintiffs present no admissible expert testimony on Koen's death as required by Texas law. (Mot. Summ. J., Dkt. 112).

Plaintiffs move to partially exclude the testimony of Monsanto's expert witnesses who plan to testify on the link between glyphosate and NHL. (Mots. Exclude, Dkts. 113, 114, 115, 116). Plaintiffs also move for summary judgment on Monsanto's affirmative defenses, including negligent conduct, contributory negligence, improper use of products, and failure to mitigate. (Mot. Summ. J., Dkt. 117). In a motion to strike Plaintiffs' motions, Monsanto argues that Plaintiffs' motions are untimely because they should have been raised in the MDL proceedings that addressed evidentiary matters relating to glyphosate and NHL. (Mot. Strike, Dkt. 122).

## II. LEGAL STANDARDS

### A. Non-Retained Expert Witnesses

Federal Rule of Civil Procedure 26 requires a party to disclose the identity of any expert witness it may use at trial. Fed. R. Civ. P. 26(a)(2)(A). The disclosure must be accompanied by a written report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). Non-retained expert witnesses are exempt from Rule 26's reporting requirement. Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment ("The requirement of a written report in paragraph (2)(B) . . . applies only to those experts who are retained or specially employed to provide such testimony . . . . A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.").

In the case of physicians, non-retained expert witnesses must confine their testimony to "facts disclosed during the care and treatment of the patient." *Brown v. Best Foods, A Div. of CPC Intern., Inc.*, 169 F.R.D. 385, 389 (N.D. Ala. 1996); *see also Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 871 (6th Cir. 2007) ("[A] report is not required when a treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment."). In addition to discussing a specific diagnosis, a treating physician may opine as to the causation of a plaintiff's injuries and a plaintiff's prognosis as long as the doctor formed those opinions "based on the care-provider's personal knowledge and observations obtained during the course of care and treatment." *Garcia v. City of Springfield Police Dep't*, 230 F.R.D. 247, 249 (D. Mass. 2005).

When determining whether to require a treating physician to provide an expert report, courts should consider the purposes behind Rule 26(a)(2)(B) and the fairness of requiring the opposing party to proceed without the report. *See, e.g.*, *Watson v. United States*, 485 F.3d 1100, 1107 (10th Cir.

5

2007) (Gorsuch, J.) (noting that the rulemakers "seemed concerned, for example, about the resources that might be diverted from patient care if treating physicians were required to issue expert reports as a precondition to testifying" and observing that the Federal Rules "supply other mechanisms, besides formal reports, for extracting the views of an expert witness . . . .").

### B. *Daubert* Motions to Exclude

The root of the court's admissibility analysis is Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court has interpreted this rule as imposing a "gatekeeping role" upon district court judges, tasking them with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "The reliability prong mandates that expert opinions be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted). "The relevance prong requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue." *Id.* (internal quotation marks omitted). The burden on the proponent of the expert testimony is only to prove, by a preponderance of the evidence, that the testimony is reliable; they need not prove the expert's testimony is correct. *Id.*

The *Daubert* standard requires courts "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The *Daubert* inquiry "'is not intended to serve as a replacement for the adversary system.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Accordingly, "a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.*

### C. Summary Judgment

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170,

175 (5th Cir. 2000). Courts must view the summary judgment evidence in the light most favorable to the nonmovant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

### III. DISCUSSION

The Court will first address Monsanto's motions to exclude before turning to Monsanto's motion for summary judgment. The Court will then turn to Plaintiffs' motions to exclude, Plaintiffs' motion for partial summary judgment, and Monsanto's motion to strike Plaintiffs' motions.

### A. Dr. Stan Smith

#### 1. Dr. Smith's Background, Research, and Testimony

Monsanto first moves to exclude Dr. Stan Smith, Plaintiffs' expert witness on damages. (Dkt. 106). Dr. Smith has a Ph.D. in economics and has worked as a forensic economist for over 30 years. (Smith CV, Dkt. 128-2). In his work, Dr. Smith estimates a reasonable dollar value for the economic and noneconomic (or "hedonic") value of a human life. (Smith Report, Dkt. 106-1, at 24–26). Dr. Smith's "loss of the value of life" ("LVL") method estimates the value of life by examining willingness to pay for potentially life-saving interventions and, conversely, an individual's willingness to take on additional hazards for incremental pay increases. (*Id.* at 16–26). This "willingness to pay" approach attempts to quantify the value of life based on how much individuals will pay to reduce the risk of death. *See* Dennis C. Taylor, *Your Money or Your Life?: Thinking About the Use of Willingness-to-Pay Studies to Calculate Hedonic Damages*, 51 Wash. & Lee L. Rev. 1519, 1521 (1994). Using this method, Dr. Smith intends to tell the jury that the value of Koen's enjoyment of his life was approximately $4.7 million, that the value of life services Koen offered to his family was roughly $2.2 million, and that Koen's family's loss of society and relationship is roughly $2.7 million. (Smith Report, Dkt. 106-1, at 26–42).

Monsanto moves to exclude Dr. Smith's testimony under Rule 702 on four grounds: (1) his LVL statistical method of valuing human life has never been accepted under Texas law; (2) generic

statistical measures are inapposite where juries are asked to compensate plaintiffs for a particular loss

of life; (3) LVL statistical measures are precautionary insurance metrics, not indicative of losses that

have already occurred; and (4) Dr. Smith makes arbitrary factual assertions and amendments to his

results to try to fit the facts of this case. (Mot. Exclude, Dkt. 106, at 1).

2. Dr. Smith's Opinions are Inadmissible

Under *Daubert*, a proponent must show "by a preponderance of the evidence that: (1) the

expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is

reliable." *See Empire Indem. Ins. v. N/S Corp.*, No. 4:11-CV-166, 2012 WL 13006242, at *1 (E.D. Tex.

July 12, 2012). Although there is little debate that Dr. Smith is a qualified economist, Plaintiffs do

not meet the second or third *Daubert* criteria. Post-death hedonic damages are not relevant or

reliable indicators for jurors to assess loss-of-life damages. "There still has never been a reported

federal decision decided under *Daubert* in which a trial court permitted hedonic damages testimony

involving specific dollar values for the plaintiff." *Valenzuela v. City of Anaheim*, 29 F.4th 1093, 1105

(9th Cir. 2022) (citing Thomas R. Ireland, *Trends in Legal Decisions Involving Hedonic Damages From

2000–2012*, 19 J. L. & Econ. 61, 63 (2012)). "[F]ederal courts which have considered expert

testimony on hedonic damages in the wake of *Daubert* have unanimously held quantifications of such

damages inadmissible." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1245 (10th Cir. 2000) (collecting

cases).

Several courts have ruled on the admissibility of Dr. Smith's testimony and the

overwhelming majority have concluded that his "willingness-to-pay" methodology is either

unreliable or not likely to assist the jury in valuing hedonic damages. *See, e.g., Allen v. Bank of Am.,

N.A.*, No. CCB–11–33, 2013 WL 1164898, at *12 (D. Md. Mar. 19, 2013); *Richman v. Burgeson*, No.

98 C 7350, 2008 WL 2567132, at *2–4 (N.D. Ill. June 24, 2008); *Davis v. ROCOR Int'l*, 226 F.Supp.2d

839, 842 (S.D. Miss. 2002); *Saia v. Sears Roebuck & Co.*, 47 F. Supp. 2d 141, 148–50 (D. Mass. 1999);

*Brereton v. United States*, 973 F. Supp. 752, 758 (E.D. Mich. 1997); *Kurncz v. Honda N. Am., Inc.*, 166 F.R.D. 386, 388–90 (W.D. Mich. 1996); *Ayers v. Robinson*, 887 F. Supp. 1049, 1059–64 (N.D. Ill. 1995); *Sullivan v. U.S. Gypsum Co.*, 862 F. Supp. 317, 321 (D. Kan. 1994); *Mercado v. Ahmed*, 756 F. Supp. 1097, 1103 (N.D. Ill. 1991), *aff'd*, 974 F.2d 863, 868–71 (7th Cir. 1992); *see also Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1195 n.5 (9th Cir. 2005) (collecting state cases where Dr. Smith's testimony was excluded); *Smith v. Jenkins*, 732 F.3d 51 (1st Cir. 2013). *But see Sherrod v. Berry*, 629 F. Supp. 159, 162–64 (N.D. Ill. 1985) (allowing Smith's testimony), *aff'd*, 827 F.2d 195, 205–06 (7th Cir. 1987), *vacated and remanded on other grounds*, 856 F.2d 802 (7th Cir. 1988).

The Court shares the concerns echoed by the substantial majority of courts over the past three decades. Dr. Smith's LVL calculation is akin to the "value of statistical life" or "VSL" method used by economists to calculate certain tradeoffs for questions of regulatory or economic policy. *See, e.g.*, "Departmental Guidance on Valuation of a Statistical Life in Economic Analysis," United States Department of Transportation (Mar. 23, 2021) (Dkt. 106-4); W. Kip Viscusi, *Misuses and Proper Uses of Hedonic Values of Life in Legal Contexts*, 13 J. For. Econ. 111, 116 (2000)). While LVL/VSL may be useful in a regulatory context, the framework does not answer the question that the jury must ask in awarding damages, which is what amount of damages would compensate Plaintiffs for their specific injuries and their loss of this specific family member, Koen. As another court has held, Dr. Smith's "willingness-to-pay studies do not relate in any way to the actual component of damages, the enjoyment of life." *Wilt v. Buracker*, 191 W. Va. 39, 443 S.E.2d 196, 205 n.15 (1993); *see also Sullivan*, 862 F. Supp. at 321 ("The studies relied on by Mr. Smith do not use methodology designed to calculate the loss of enjoyment of life, yet are nonetheless extrapolated by Mr. Smith into what he claims to be valid data for calculating damages for . . . loss of enjoyment of life.").

Further, Dr. Smith's calculations do not reach a sufficiently individual level to guide the jury in their assessment of damages. While Dr. Smith may testify about the general regulatory value of

life, the jury here must decide the value of Koen's life and the specific loss of his life to his family. This is reflected in the language of Texas's remedies law, which states that a jury "may award damages in an amount proportionate to the injury resulting from *the* death"—not a generic or statistically average death. Tex. Civ. Prac. & Rem. § 71.010(a) (emphasis added).

This Court therefore finds that Smith's LVL calculation is inapplicable to the jury's determination regarding the specific damages at issue in this wrongful death suit. Because Smith speaks only generally to the statistical value of life, and not the specific loss that Plaintiffs have suffered from Koen's death, his testimony is more likely than not to confuse the jury in its calculation of damages. Accordingly, the Court will exclude Dr. Smith's testimony.

## B. Dr. David Morledge

### 1. Background

Dr. Morledge is a neurologist who began treating Koen in April 2022 when he was hospitalized with a "Parkinsonian-type syndrome." (Pls.' Resp., Dkt. 127, at 2). Dr. Morledge then prescribed therapy for presumed Parkinson, but Koen did not respond to the medications. (*Id.*). When Koen's condition failed to improve, Dr. Morledge considered other diagnoses, including Lewy body dementia and "a paraneoplastic syndrome related to [Koen's] lymphoma." (Morledge Dep., Dkt. 107-1, at 18). At his deposition, Dr. Morledge testified that he had "suspected a paraneoplastic process before [Koen] passed," but that PEM is "extremely difficult to diagnose." (*Id.* at 24). He added that his suspicions were based on Koen's "history of . . . non-Hodgkin's lymphoma," as well as "several case studies" linking PEM with NHL "that have been reported in the literature." (*Id.* at 21). Dr. Morledge never formally diagnosed Koen with PEM while Koen was his patient. (*Id.* at 24).

Following Koen's death, however, his body was examined by pathologists hired to conduct a post-mortem autopsy. That autopsy, specifically the opinion of Dr. Deisch, found that Koen died of

an inflammatory brain injury "most consistent with a paraneoplastic encephalomyelitis [PEM]."
(Deisch Report, Dkt. 109-1, at 82). In his deposition, Dr. Morledge stated that this finding
confirmed his suspicions of a paraneoplastic condition and that, in his opinion, "the immediate
cause of death . . . was pneumonia, with the secondary cause being the paraneoplastic syndrome."
(Morledge Dep., Dkt. 107-1, at 23). He added that he has not consulted with other doctors since
learning the autopsy results, that he did not treat Koen "in connection with any litigation," that his
work for Koen was "[t]otally separate" from the litigation, and that he has not signed a retainer or
fee agreement. (*Id.* at 30–34). After Koen's death, Plaintiffs disclosed Dr. Morledge as a non-retained
expert witness. He intends to testify at trial that Koen died due to PEM, based in part on his clinical
diagnosis as well as Koen's neurological autopsy. (Mot. Exclude, Dkt. 107, at 1).

2. Dr. Morledge's Testimony Is Admissible

Monsanto moves to exclude Dr. Morledge from testifying outside of his actual treatment of
Koen—namely, that Koen died of PEM rather than the other diseases that Dr. Morledge had
formally diagnosed while Koen was his patient. (*Id.* at 1–2). Monsanto contends that Dr. Morledge's
treatment of Koen is confined strictly to the opinions he rendered while Koen was alive and that it
would be improper to allow Dr. Morledge to testify as to findings made by other physicians after
Koen passed. (*Id.*).

In typical cases, a treating physician designated as a non-retained expert under Rule
26(a)(2)(C) "is confined to those facts or data the physician learned during actual treatment of the
plaintiff." *Rea v. Wisconsin Coach Lines, Inc.*, No. CIV.A. 12-1252, 2014 WL 4981803, at *2 (E.D. La.
Oct. 3, 2014). Monsanto repeatedly urges that "the proper scope of Dr. Morledge's testimony is
limited to his time treating Koen for a 'Parkinsonian-type syndrome' from April 18, 2022 to
November 1, 2022." (Reply, Dkt. 136, at 3). Because the diagnosis of PEM was not formally made

12

until after Koen's autopsy, Monsanto contends that the PEM diagnosis was developed for the purpose of litigation and falls outside the scope of Dr. Morledge's medical treatment of Koen. (*Id.*).

The Federal Rules do not contemplate such a strict exclusion of non-retained experts. Rule 26(a)(2)(C) expressly states that a witness who is not required to provide a written report can present "evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(C). In turn, Rule 703 states, "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Rule 703 also clarifies, "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.* Dr. Morledge, as a physician, reasonably relies on the opinions of referrals and diagnoses rendered by subspecialists.[2] That is information he "has been made aware of" and the kind of information "in the particular field [he] would reasonably rely on . . . ." *Id.*

Although the PEM diagnosis occurred after Koen's death, it is factually intertwined with the opinions Dr. Morledge developed as Koen's treating neurologist. While Dr. Morledge never formally diagnosed Koen with PEM, he suspected a paraneoplastic disease during his treatment of Koen and considered it one of two possibilities for Koen's neurological decline. Moreover, he noted that the disease is very rare and "extremely difficult to diagnose." (Morledge Dep., Dkt. 107-1, at 24). The autopsy finding directly relates to Dr. Morledge's suspicions and confirms through post-mortem testing a diagnosis that could not be easily made during Dr. Morledge's treatment of Koen.[3]

---

[2] Monsanto suggests that Dr. Morledge does not regularly rely on the opinion of a physician conducting an autopsy. Monsanto fails to explain why that reliance is unreasonable. If Dr. Morledge regularly relies on diagnostics conducted by subspecialists, including neuropathologists, then the diagnostic material is "those kinds of facts or data" he would use "in forming an opinion on the subject," even if diagnosis comes post-mortem. Fed. R. Evid. 703.

[3] This factual background distinguishes the case from *Mohney v. USA Hockey, Inc.*, 138 F. App'x. 804, 811 (6th Cir. 2005), which Monsanto relies on in support of exclusion. (*See* Reply, Dkt. 136, at 2–3). In *Mohney*, a physician rendered a diagnosis of a patient who was injured in a hockey accident. 138 F. App'x at 811. The physician ended his treatment, and well afterwards, was provided a video of the incident at issue. *Id.* His

The key differentiating factor between a typical physician's review of a diagnosis during treatment and Dr. Morledge's review of Dr. Deisch's diagnosis is that here, the diagnostic findings were made after Koen died. Although his treatment of Koen may have ended, Dr. Morledge's review of the diagnosis is directly related to his prior suspicions rendered during the course of care and falls within the "permissive core on issues pertaining to treatment." *Fielden*, 482 F.3d at 871. The fact that Dr. Deisch made his diagnostic findings in the context of a post-mortem autopsy does not move the report outside of Dr. Morledge's expertise because those findings remain the kind of subspecialist diagnosis that Dr. Morledge may reasonably interpret and rely on.

Monsanto next suggests that Dr. Morledge's testimony would be particularly problematic because "his opinions on Koen's cause of death change once he reviewed [the autopsy]." (Mot. Exclude, Dkt. 107, at 8). As explained above, Dr. Morledge considered a set of differential diagnoses, consistent with a standard process whereby a list of plausible conditions is considered based on a patient's clinical presentation and systematically refined through diagnostic testing. Through that process, Dr. Morledge suspected two possibilities: PEM or Lewy body dementia. Although he considered Lewy body dementia more likely based on the clinical information available to him at the time, he suspected PEM and never ruled out PEM as a possibility. The autopsy confirmed PEM rather than Lewy body dementia. That is not an impermissible change of opinion, but a further step in Dr. Morledge's diagnostic reasoning. The autopsy confirms one of Dr.

---

testimony was excluded in part as to opinions formed based on review of the videotape because he prepared his affidavit after his care had stopped and with "no evidence that [he] reached the same conclusions . . . at the time he treated" the plaintiff. *Id.* Here, Dr. Morledge did reach the conclusion that PEM was a possible diagnosis prior to seeing Dr. Deisch's autopsy. Moreover, the autopsy was not existing evidence that should have been provided to Dr. Morledge when he began treating Koen, but the next step in the differential diagnostic. There is a difference then, from a physician who reviews new evidence entirely detached from their treatment of a patient, as in *Mohney*, and a physician who reviews evidence after a patient has died that would have constituted the next step of a differential diagnosis and is separated from the patient's "treatment" only because the patient has gone into hospice and died.

Morledge's suspicions and therefore falls within the "core" differential diagnosis he may reasonably testify to.

### 3. Any Improper Designation Was Substantially Justified

Even if Dr. Morledge's testimony did fall outside the confines of Rule 26(a), the Court would still allow the testimony under Rule 37. Federal Rule of Civil Procedure 37(c)(1) provides that when "a party fails to . . . identify a witness as required by Rule 26(a)," they may offer that witness if "the failure was substantially justified or is harmless." The Fifth Circuit employs a four-factor test in determining whether the failure to disclose is harmless: "(1) the importance of the witness's testimony; (2) the prejudice to the opposing party of allowing the witness to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to [comply with 26(a)'s disclosure requirement]." *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir. 1998); *E.E.O.C. v. General Dynamics Corp.*, 999 F.2d 113, 115 (5th Cir. 1993) (same).

Here, the factors weigh in favor of allowing Dr. Morledge's testimony. First, Dr. Morledge's testimony on the PEM finding is important. Dr. Morledge believed that a paraneoplastic process was a possible diagnosis, which was confirmed by the autopsy. That finding, even though it was made after Koen's death, effectively resolves the final step in the diagnostic process.[4] It explains why Koen may have not responded to Parkinson treatment and allows Plaintiffs to potentially exclude Lewy body dementia as a cause of his neurological decline.

Second, the prejudice of the non-disclosure is small. Monsanto had the opportunity to depose Dr. Morledge, will be able to cross-examine him at trial, and is fully aware of his opinions related to the case. The only functional difference is that Dr. Morledge has not submitted a retained

---

[4] Monsanto argues that the testimony is not critical because Dr. Morledge's view of the autopsy is unreliable. (Reply, Dkt. 136, at 5–6). That issue can be addressed upon cross-examination, and at any rate, the reliability of the autopsy appears to speak more to whether the autopsy's findings are admissible, not Dr. Morledge's opinion as to whether they are consistent with PEM during the course of Mr. Koen's treatment.

expert report, but in his deposition, Dr. Morledge has already disclosed the pertinent material that would be in any such report. There is no unfair surprise from Dr. Morledge's designation as a non-retained expert.

Instead, Monsanto argues that it will be prejudiced by Dr. Morledge's testimony because it now lacks the ability to disclose rebuttal opinions. (*See* Reply, Dkt. 136, at 6–7). The Court is deeply skeptical of this argument. Monsanto has had the opportunity to offer rebuttal opinions, and it has been clear since Koen's autopsy that the link between his NHL and the cause of his death would be a central issue in this case. Indeed, the Court reopened discovery for the sole purpose of allowing the parties to obtain evidence and experts on Koen's cause of death. The Court does not find it credible that Plaintiffs' designation of Dr. Morledge as a non-retained expert would have prevented Monsanto from effectively contesting such a core medical issue.

The third factor—whether there is time to grant a continuance—is neutral, because a continuance is not necessary. Monsanto is fully aware of Dr. Morledge's planned testimony and has had the opportunity to depose him. Plaintiffs also have good cause for not submitting an expert report. Dr. Morledge is not a retained witness under the plain language of Rule 26(a)(2)(B) because he is not "retained or specially employed to provide expert testimony . . . ." He was a treating physician, and it was reasonable for Plaintiffs to designate him as non-retained. *See* Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment ("A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."). The portion of Dr. Morledge's testimony that arguably falls outside his firsthand knowledge of Koen is minor, relating solely to the autopsy's resolution of two potential diagnoses. And given this extremely small overlap, it is difficult to imagine what benefit an expert report would have conveyed to Monsanto that they cannot have addressed in the deposition or cross-examination.

Largely separate from the rest of their motion, Monsanto moves to exclude Dr. Morledge's testimony as to causation between PEM and NHL. In his deposition, Dr. Morledge confirmed that he would not offer "opinions that . . . to the extent that Koen had a paraneoplastic process that it was caused by his NHL." (Dr. Morledge Dep., Dkt. 107-1, at 31). Nonetheless, the motion is potentially overbroad—a blanket exclusion of any testimony linking NHL to PEM may prohibit admissible testimony from Dr. Morledge explaining why he believed Koen to have a paraneoplastic process due to his history of NHL. Therefore, while Dr. Morledge cannot offer opinions he has disclaimed, the contours of that testimony are better determined by carrying that portion of Monsanto's motion to trial.

### C. Dr. David Arboe

#### 1. Background

Dr. Arboe is a forensic pathologist who conducted a full-body autopsy on Koen. (Pls.' Resp., Dkt. 130, at 2). He prepared three reports: a preliminary report on April 7, 2024, (Dkt. 130-1), a final report on July 6, 2023, (Dkt. 130-2), and an amended final report on July 27, 2023. (Dkt. 130-3). The amended final report lists Koen's immediate cause of death as pneumonia and lists other significant conditions as including: Atherosclerotic Cardiovascular Disease, Hypertension, History of NHL, and Severe Meningoencephalitis. (*Id.*). In his deposition, Dr. Arboe states that "other significant conditions" are those which may or may not have contributed to a person's passing. (Arboe Dep., Dkt. 108-1, at 29). Dr. Arboe also states that he lifted language from the report of another physician, Dr. Deisch, who had conducted a post-mortem neuropathology consultation, and incorporated it into his own final report. (*Id.* at 31).

#### 2. Dr. Arboe's Opinions are Admissible

Monsanto first moves to exclude Dr. Arboe's testimony on the grounds that it is not based on reasonable medical probability and therefore cannot assist the jury in determining causation.

(Mot. Exclude, Dkt. 108, at 6). Texas law requires "reasonable medical probability" that a condition contributed to a medical issue, and Monsanto cites several cases holding that a "mere possibility" is insufficient. (*Id.* (citing *Waltrip v. Bilbon Corp.*, 38 S.W.3d 873, 883 (Tex. App.—Beaumont 2001, pet. denied); *Smith v. Sw. Bell Tel. Co.*, 101 S.W.3d 698, 702  (Tex. App.—Fort Worth 2003, no pet.); *Jones v. Miller*, 964 S.W.2d 159, 163 (Tex. App.—Houston [14th Dist.] 1998, no pet.))). Here, Monsanto conflates Plaintiffs' burden of proof with the admissibility of expert testimony. To offer expert testimony, Plaintiffs need only show that a given expert's testimony meets the requirements under the federal rules. That is an independent question from whether that testimony is sufficient to succeed on the merits. Indeed, the three Texas cases cited by Monsanto all deal with a plaintiff's burden of proof on the merits, not the admissibility of testimony. The burden of proof under Texas tort law does not govern the admissibility of Dr. Arboe's testimony under the Federal Rules.[5]

Turning to Dr. Arboe's reliability, Monsanto moves to exclude his testimony concerning Koen's NHL, alleging that Dr. Arboe did not make his own finding of PEM but instead copied the findings of the post-mortem neuropathologist, Dr. Deisch. (Mot. Exclude, Dkt. 108, at 7–9). Plaintiffs note that Dr. Arboe is not a neuropathologist, so his employer—American Forensics—contracted out the post-mortem examination of Koen's nervous system. (Pls.' Resp., Dkt. 130, at 6). The neuropathologist—Dr. Diesch—performed the autopsy on Koen's brain and prepared a report on his findings. (*Id.* at 6–7). Dr. Arboe incorporated that report into his autopsy report.

Dr. Arboe's testimony does not become inadmissible merely because it incorporates findings from other physicians and subspecialists. That is routine medical practice: a generalist refers certain diagnostics to specialists, and then incorporates the specialists' findings in their overall diagnosis.

---

[5] In support of its argument, Monsanto cites a Fifth Circuit case that states, "Expert testimony is needed to satisfy the reasonable medical probability standard for establishing a causal link." (Reply, Dkt. 137, at 2–3 (citing *Anderson v. Siemens Corp.*, 335 F.3d 466, 475 (5th Cir. 2003))). Monsanto reads the sentence in reverse. Expert testimony is needed to satisfy the reasonable medical probability standard. That does not mean that the reasonable medical probability is needed to satisfy the admissibility of expert testimony, especially in the case of non-retained experts.

The generalist is not barred from mentioning parts of his overall diagnosis simply because they were conducted by a specialist, especially where the specialist is also testifying as to his findings. Dr. Arboe may testify to his autopsy report, including findings from Dr. Deisch's neuropathology exam.

Monsanto next contends that Dr. Arboe should have been designated as a retained expert witness because counsel provided him with Koen's medical records. (Mot. Exclude, Dkt. 108, at 8–9 ("By providing Dr. Arboe with materials and information that went beyond his own personal examination and observations, Plaintiffs transformed Dr. Arboe into a retained expert who was required to provide a report and other disclosure materials required under Rule 26(a)(2)(B).")). The specific circumstances of Koen's autopsy, however, do not show that Plaintiffs provided him with information akin to a retained expert. After Koen's death, the investigator assigned to Koen's autopsy, a separate individual from Dr. Arboe, spoke with Koen's counsel's paralegal. (Resp., Dkt. 130, at 8). The paralegal provided Koen's information as requested by the investigator. At the time, trial was set for less than a month away, so the paralegal provided the investigator with medical records directly, rather than have Koen's family sign a medical release, in order to expedite the autopsy. (*Id.*). The investigator received medical records related to Koen's diagnosis and treatment for NHL as well as available records from Texas Neurorehab, a neurological facility that cared for Koen. (*Id.*). Those materials were passed onto Dr. Arboe, who considered them in his finding that NHL may have contributed to Koen's death. (*Id.*).

These circumstances do not transform Dr. Arboe into a retained expert. The materials he relied upon may have been provided by Plaintiffs' counsel, but they consisted only of medical records that would have otherwise been provided by Plaintiffs themselves. In the context of post-mortem autopsies performed while litigation is pending, it is not inherently improper for a family's attorney to provide physicians with medical records, as the attorneys will reasonably be involved in managing the estate and preserving medical records as the family is grieving. That is especially true

here, where Plaintiffs allege their counsel provided medical records directly to American Forensics in order to expedite the autopsy in light of this trial scheduled for less than one month away. As a pathologist, Dr. Arboe would have reviewed Koen's medical records, regardless of how they were obtained, before submitting a final report. Dr. Arboe does not become a retained expert witness solely because his office received medical records from Plaintiffs' counsel in order to render a medical conclusion as part of their post-mortem process. *See Rivera v. Walmart, Inc.*, No. CV 19-12616, 2022 WL 1080976, at *4 (E.D. La. Mar. 7, 2022) ("Dr. Gardner is still analogous to a treating physician because she formed her opinion on Mr. Rivera's cause of death while carrying out her normal job duties in the coroner's office—not because Plaintiffs hired her to testify to a certain opinion.").

Last, Monsanto alleges that Dr. Arboe should be excluded from testifying about Koen's NHL as a potential contributing factor because Dr. Arboe did not review Koen's medical records after 2020. (Arboe Dep., Dkt. 108-1, at 23–24). Again, this goes to the weight rather than the admissibility of the testimony. The timeliness of the medical records speaks to the accuracy of Dr. Arboe's conclusions and can be adequately addressed on cross-examination. Accordingly, the Court will deny Monsanto's motion to exclude Dr. Arboe's testimony.

### D. Dr. Jeremy Deisch

#### 1. Background

The Court turns next to Dr. Jeremy Deisch, a neuropathologist who was asked by American Forensics to perform an autopsy on Koen's nervous system. After his neuropathological autopsy, Dr. Deisch concluded that Koen died of an inflammatory brain injury "most consistent with [PEM]" and that "[t]his condition has been reported . . . with a wide variety of neoplastic conditions, including non-Hodgkin lymphoma." (Deisch Report, Dkt. 109-1, at 82). Dr. Morledge relied on Dr.

Deisch's report to rule out Lewy body dementia, and Dr. Arboe included it in his final autopsy report. *See supra*, Sections III. B–C.

2. Dr. Deisch's Opinions are Admissible

Monsanto moves to exclude Dr. Deisch's testimony on the basis that Plaintiffs failed to provide him with Koen's entire medical history when he conducted his neuropathology autopsy and then updated the medical record after Dr. Deisch made his findings. (Mot. Exclude, Dkt. 109). As with Dr. Arboe, Plaintiffs provided American Forensics with Koen's medical records up to 2020 but did not provide the company with materials from 2021 to 2023. (*Id.*). American Forensics then passed along these limited medical records to Dr. Deisch. (*Id.*). Accordingly, when Dr. Deisch prepared his report on Koen, he only had medical information up to 2020 and lacked the knowledge that Koen's NHL had gone into remission.

Before his deposition, however, Plaintiffs provided Dr. Deisch with updated medical records, including ones from 2021 to Koen's death in 2023. (*Id.*). Monsanto contends that Dr. Deisch's opinion changed based on these new medical records, and he should be disqualified as a non-retained expert witness because he updated his opinion based on material outside of his scope of care. (*Id.*). In his autopsy report, Dr. Deisch concludes that "[PEM] has been associated with a wide variety of neoplastic conditions, including [NHL] . . . ." (Deisch Report, Dkt. 109-1, at 82). In his deposition testimony, Dr. Deisch stated that Koen's PEM "was more likely than not caused by" Koen's NHL. (Deisch Dep., Dkt. 109-1, at 45–46). Monsanto suggests that this change "goes beyond his personal observations made during the examination and is far beyond the scope of a non-retained expert." (Mot. Exclude, Dkt. 109, at 9).

At the outset, it is not clear that Dr. Deisch did in fact materially change his conclusions. Dr. Deisch moves from association to causation, but those two concepts are not mutually exclusive. Moreover, Dr. Deisch appears to opine on causation only because Monsanto directly questioned

21

him on causation in his deposition. Nor is this a radical medical conclusion: paraneoplastic processes are caused by cancers, so Koen's history of NHL (and no other cancers) lends itself to the inference that NHL caused his PEM.

Monsanto appears to suggest that Dr. Deisch reaches this causal conclusion only because Plaintiffs' counsel provided him with "hand-picked" medical records. (Mot. Exclude, Dkt. 109, at 4, 8). A physician need not exhaustively review all medical records to render a reliable opinion as a non-retained expert. The thoroughness of Dr. Deisch's review is a matter for cross-examination, not admissibility.

Moreover, Dr. Deisch's autopsy findings largely fit with Koen's condition in the omitted medical records. In his autopsy, Dr. Deisch noted that he found no active NHL or NHL involvement in Koen's brain. (Deisch Report, Dkt. 109-1, at 82). This tracks with potential remission of his NHL, so it is far from evident that a review of Koen's most recent medical records would have changed Dr. Deisch's conclusion. Plaintiffs' failure to initially provide Dr. Deisch with the 2021 to 2023 medical records does not render Dr. Deisch unreliable because those records align with his finding that NHL was not active in his brain.

Monsanto also contends that if Dr. Deisch found no NHL in the brain, then he cannot reasonably testify that NHL caused Koen's PEM. (Mot. Exclude, Dkt. 109, at 10). This argument rests on the premise that for NHL to cause PEM, the brain must contain identifiable traces of NHL. Plaintiffs argue the opposite, suggesting that NHL may cause PEM even where NHL is not identifiable in an autopsy. (Resp., Dkt. 127, at 7–8). The premise of Monsanto's motion is a contested factual question for the factfinder to decide. At this stage, it would be improper for the Court to exclude testimony from a qualified neuropathologist based on Monsanto's own view of the medical literature. In effect, Monsanto only raises the question of whether Dr. Deisch's conclusion is correct, not whether it is reliable.

Monsanto next suggests that Dr. Deisch's testimony may be unreliable because he reached his conclusion that PEM is associated with neoplastic conditions after "he ran a PubMed search[.]" (Mot. Exclude, Dkt. 109, at 5). This is a matter for cross-examination, not a basis to exclude. Physicians, like many other professionals, may rely on research databases to form their opinions, especially as they relate to rare and uncommon diseases such as PEM.

Last, Monsanto suggests that Dr. Deisch's opinion and the opinions of other physicians relying on Dr. Deisch's findings are unreliable because he suggested that antibody[6] testing could be useful in certifying the PEM diagnosis, but Plaintiffs did not conduct antibody testing. (Mot. Exclude, Dkt. 109, at 5 ("[W]hile Dr. Deisch suggested that antibody testing could determine the cause of Koen's PEM, neither he nor Plaintiffs conducted that testing.")). However, Plaintiffs note that they preserved Koen's brain "and made it available for Monsanto, in the event that the company wanted to retain its own expert to review it. . . . Monsanto did not do so."). Plaintiffs' decision not to conduct antibody testing speaks to the degree of certainty in the PEM diagnosis, not its reliability. As Dr. Deisch testified, antibody testing would "move the marker to 100 percent" from 98 percent. (Desich Dep., Dkt. 129-3, at 17, 37, 109). A 98 percent showing is not unreliable, and Rule 702 does not suggest experts must be 100 percent certain. *See Daubert*, 509 U.S. at 590 ("[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty[.]"). Plaintiffs' decision not to conduct antibody testing again goes to the weight, not the admissibility.

Finally, as with Dr. Morledge, the Court would find that any improper designation of Dr. Deisch is substantially justified under Rule 37. Again, the Court looks to "(1) the importance of the witness's testimony; (2) the prejudice to the opposing party of allowing the witness to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the

---

[6] The parties use "antigen" and "antibody" testing interchangeably.

party's failure to [comply with 26(a)'s disclosure requirement]." *United States v. $9,041,598.68*, 163 F.3d at 252. The testimony here is significant, because Dr. Deisch conducted the neuropathology autopsy on Koen that linked his death to PEM. As the neuropathologist, Dr. Deisch's autopsy is the most reliable indicator of neurological processes that led to Koen's death.

Plaintiffs' decision to designate Dr. Deisch as non-retained rather than retained is unlikely to cause serious prejudice. Dr. Deisch is not paid for his testimony or specially employed to provide expert testimony. Plaintiffs provided Dr. Deisch's neuropathological autopsy report to Monsanto. Monsanto has had the opportunity to depose Dr. Deisch and question the validity of his medical conclusions. It may do so again in cross-examination and expose any weaknesses stemming from Dr. Deisch's inability to review Koen's 2021–2023 medical records prior to his autopsy. *See Rivera*, 2022 WL 1080976, at *4 ("Thus, Plaintiffs' disclosure of Dr. Gardner as a non-retained expert, combined with Walmart's opportunity to take Dr. Gardner's deposition, was sufficient to prevent significant prejudice to Walmart."). As with Dr. Morledge, Monsanto has been well aware of the PEM finding and its centrality to this case. It is of no surprise to Monsanto that Dr. Deisch will testify as a non-retained expert witness to the conclusion rendered in his own autopsy report. Accordingly, even if Dr. Deisch had been improperly designated, that omission would have been substantially justified under Rule 37.

### E. Plaintiffs' Retained Medical Experts

#### 1. Background

##### a. Dr. Kyle Shaw

Plaintiffs designated Dr. Kyle Shaw, a board-certified pathologist, as a retained expert witness. (Resp., Dkt. 131, at 2). In his deposition testimony, Dr. Shaw explains how paraneoplastic processes result from the body's response to cancer. (Shaw Dep., Dkt. 131-2, at 63). Crucially, Dr. Shaw testifies that paraneoplastic processes can continue after the treatment of an underlying cancer

and that if a body "get[s] rid of the cancer . . . that doesn't mean that [the PEM] will go away[.]" (*Id.* at 98). In his report, Dr. Shaw ultimately concludes that Koen's cause of death is "Pneumonia, due to complications of [PEM], due to complications of follicular lymphoma" with other contributing factors. (Shaw Report, Dkt. 110-2, at 2).

Monsanto mounts a *Daubert* challenge against Dr. Shaw's testimony, arguing that his conclusion is "pre-determined" based on Dr. Arboe's and Dr. Deisch's findings and unsupported by reliable medical literature. (Mot. Exclude, Dkt. 110-1, at 15). Monsanto argues that Dr. Shaw is not qualified to testify as to PEM, that his conclusion lacks an adequate foundation, that he failed to apply a reliable methodology in reaching his conclusion by failing to consider objective medical evidence or rule out other alternatives, and that he merely parrots the opinions of other physicians. (*Id.*).

### b. Dr. Michael Freeman

Dr. Michael Freeman is an epidemiologist with a background in forensic medicine. (Resp., Dkt. 133, at 2). He is an associate professor of forensic medicine, a member of the Royal College of Pathologists, and has a Doctor of Medicine degree from the United Kingdom, among other credentials. (Dr. Freeman Report, Dkt. 133-2, at 25). During the MDL proceedings, Dr. Freeman was designated as a retained expert witness on the link between glyphosate and NHL, and the presiding judge ruled that his testimony would be admissible. (*See* Order, Dkt. 33).

After the MDL remanded this case and Koen passed away, Dr. Freeman supplemented his initial report to include his opinion on Koen's passing. (Freeman Report, Dkt. 133-2). He explained,

> The autopsy finding that Koen's degenerative brain disease was most consistent with [PEM] also demonstrates a causal link between Koen's Roundup exposure and his neurological decline, which was a contributing factor in causing his death. The diagnosed brain disease was entirely due to his NHL cancer, as this was the condition that resulted in the antibodies that caused the [PEM].

(*Id.* at 25).

When asked how he reached this conclusion, Dr. Freeman explained that the paraneoplastic process was a result of Koen's NHL because "the only neoplasm that [Koen] had was the non-Hodgkin's," and added that he "would be surprised if [this] was a disputed issue." (Freeman Dep., Dkt. 133-3, at 28). He was asked whether he looked at other cancers associated with PEM and answered "No. That wouldn't be something that I would do in this case because the only cancer I'm aware in Koen's background is the [NHL]." (*Id.*).

Dr. Freeman also disputed whether Koen was "cancer-free" as Monsanto contends. He noted that "a relapse of the non-Hodgkin's lymphoma cannot be ruled in or ruled out from what I've seen in those records." (*Id.* at 47). He also defended Dr. Deisch's PEM finding, stating,

> [Dr. Deisch] does not give a list of [those] things; that's true. I mean, he's --  he's doing sort of a, you know, when you hear hoof beats, you don't think zebras.
>
> You know, if a man has got a prior history of cancer and a prior history of chemotherapy and all of these other things going on and he's dead at 52, you're saying, well, those things probably have something to do with each other. Perfectly reasonable way to operate and function here.
>
> You wouldn't start thinking about super exotic things that this man would be unfortunate enough to get coincidentally along with his history of -- of cancer. So that's not unreasonable and not outside of pretty normal practice from what I review; but on the other hand, there are some pathologists who will give an absolute laundry list of every single thing that is possible to -- that could be explanatory for something that is found on histology or in some other setting.
>
> But, you know, nobody looks at a -- a bullet wound, a gunshot wound and says, well, they could have fallen on a stick or they might have been stabbed with a very round knife.
>
> So, you know, there's a lot of intuitive inferences that are made in, at least in forensic pathology.

(*Id.* at 74–76).

In their motion to exclude Dr. Freeman's testimony, Monsanto contends that Dr. Freeman is a "serial expert witness" who "merely parrots other physicians' determinations." (Mot. Exclude, Dkt. 111, at 4).

### 2. Plaintiffs' Retained Experts are Sufficiently Qualified

Monsanto contests the qualifications of both Dr. Shaw and Dr. Freeman. To qualify as an expert, "the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004). Rule 702 provides that an expert may be qualified based on "knowledge, skill, experience, training, or education." *Id.* "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.*

### a. Dr. Shaw

Plaintiffs have shown via a preponderance of the evidence that Dr. Shaw is qualified to discuss PEM. Dr. Shaw is board-certified in pathology and has conducted over 3,000 autopsies. (Resp., Dkt. 131, at 7). Monsanto argues that he is insufficiently specialized because he is not an oncologist, epidemiologist, neurologist, or neuropathologist. (Mot. Exclude, Dkt. 110, at 6). This argument is unconvincing—pathologists specialize in the study of diseases, which is directly applicable to Dr. Shaw's conclusion that NHL caused Koen's PEM. While a neuropathologist may have had even more specialized knowledge, Rule 702 does not require such a stringent degree of sub-specialization. *See United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013) ("A lack of specialization should generally go to the weight of the evidence rather than its admissibility . . . .");

*Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) ("[A] lack of specialization does not affect the admissibility of the opinion, but only its weight."). As an experienced pathologist, Dr. Shaw is well-qualified to provide his opinion on Koen's PEM and end-of-life condition.

Monsanto contends that Dr. Shaw "has not researched PEM [and] has no specialized training or experience with PEM." (Reply, Dkt. 135, at 3–4). Again, PEM is a rare condition, and any evaluation of an expert's reliability must consider the infrequency at which PEM occurs. Dr. Shaw need not show he has "experience" with PEM because he has shown that he has knowledge of the disease, a specialized medical education, and training in pathology that allow him to reliably surview diagnoses of the disease. *See* Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, *or* education may testify . . . .") (emphasis added). Even if he lacks experience dealing with PEM specifically, Dr. Shaw's medical education and training is sufficient to render an expert opinion on the condition. There is no reason to believe that a pathologist must diagnose the same disease multiple times in order for their opinion on the disease to become reliable. Plaintiffs have adequately shown that Dr. Shaw's PEM conclusion stems from his long history as a pathologist and experience conducting or surveying autopsies. His medical expertise is more likely than not to assist the jury in understanding PEM and Koen's condition.

### b. Dr. Freeman

In its motion to exclude Dr. Freeman, Monsanto raises similar arguments. (Mot. Exclude, Dkt. 111). It alleges that Dr. Freeman does not "treat or diagnose patients[,]" is "not an expert on PEM[,]" and "has never conducted any research or been involved in nay clinical trial about any paraneoplastic syndrome." (*Id.* at 9–10). Again, Monsanto's motion speaks to experience, but not to background, education, or training. Dr. Freeman is a qualified and experienced epidemiologist with a master's degree in forensic medical science who has published on the topic of NHL. (Freeman Report, Dkt. 133-2, at 1–2). As with Dr. Shaw, it would hold Plaintiffs to an impossible burden if

the only retained experts who could testify were those who had experience with a condition that is so uncommon that, in 34 years of practice, a neurologist like Dr. Morledge had never personally seen a single case. (Morledge Dep., Dkt. 133-4, at 13). As an epidemiologist who has done research on NHL, Dr. Freeman may testify to his belief that Koen's NHL caused his PEM.

Monsanto also attacks Dr. Freeman's credentials by citing other district courts who have excluded his testimony. (Mot. Exclude, Dkt. 111, at 7–10 (citing *In re: Deepwater Horizon BELO Cases*, 3:19-cv-00963, ECF 570 (N.D. Fla. Dec. 15, 2022) (holding that Dr. Freeman's testimony should be excluded); *Dufour v. BP Exploration & Prod. Inc.*, No. 1:19-cv-591-HSO-BWR, 2023 WL 3807923, at *6–12 (S.D. Miss. Jun. 2, 2023) (same))). Those two cases, however, both relate to the Deepwater Horizon oil spill and only exclude Dr. Freeman after a detailed analysis into the particular facts of Dr. Freeman's testimony as it relates to that oil spill. The cases do not, as Monsanto implies, stand for the proposition that Dr. Freeman's testimony is necessarily or even generally unreliable. Further, the presiding judge in the MDL proceedings denied Monsanto's motion to exclude Dr. Freeman's testimony as to the separate glyphosate-NHL causation issue. (*See* Order, Dkt. 33). Overall, these decisions mean only that the Court must make a factual determination on Dr. Freeman's specific testimony on PEM and NHL, not that such testimony should be automatically excluded or included. *See Pipitone*, 288 F.3d at 245 ("[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. It is a fact-specific inquiry.") (cleaned up).

### 3. Dr. Shaw and Dr. Freeman Have Adequate Foundations

#### a. Dr. Shaw

Monsanto argues that Dr. Shaw lacks an adequate foundation for his conclusion because he "relies solely on a limited number of superficial documents" and did not perform his own autopsy of Koen. (Mot. Exclude, Dkt. 110, at 7–9). Here, Dr. Shaw reviewed over 2,000 pages of Koen's

medical records, including his records from the Texas Neuro Rehabilitation Center, his final

neuropathology report, Austin Neurological Clinic Records, Stonebridge Health Center records, his

billing, and medical records from Colonial Garden and his Halcyon Home. (Shaw Report, Dkt. 131-

4). Monsanto suggests that Plaintiffs' counsel cherry-picked the records for Dr. Shaw to review, but

that dispute goes to weight rather than admissibility. Dr. Shaw's report appears to be based on a

thorough review of many (but not all) of Koen's medical records toward the end of his life. Dr.

Shaw did not review earlier medical records, but it is again not evident to the Court that this

omission renders his opinion unreliable. Monsanto also argues that Dr. Shaw should have reviewed

Koen's medical slides, but the Court does not believe that a diagnosis must necessarily be histologic

(i.e., based on primary reviews of tissue) in order to be reliable. Overall, Dr. Shaw's reliance on 2,000

pages of select medical records does not render the testimony inadmissible.

Monsanto next contends that Dr. Shaw is not properly familiarized with PEM because he

failed to review adequate medical literature on the disease. (Mot. Exclude, Dkt. 8–9). Again, PEM is

a rare subtype of the more common paraneoplastic syndrome. Monsanto's motion rests on the

unstated premise that Dr. Shaw's familiarity with paraneoplastic processes does not translate into

familiarity with PEM. The Court is not convinced that this premise is correct. By definition,

paraneoplastic processes are caused by cancer. (*See, e.g.*, Shaw Dep., Dkt. 131-2, at 63 ("[PEM] is

thought to be an autoimmune-type response related to any of a number of different kinds of cancers

or neoplasms."); Silberstein Dep., Dkt. 131-5, at 80 ("The best way you treat [PEM] is treat the

cancer. Get rid of the cancer. It's caused by the cancer.")). Consistent with this medical

understanding, Dr. Shaw testified that PEM, a type of paraneoplastic process, may be caused by

NHL, a type of cancer. (*See* Shaw Dep., Dkt. 131-2, at 63). He therefore considered Koen's NHL to

have likely caused his PEM. (*Id.*). Dr. Shaw is still more likely than not to assist the jury through his

knowledge of paraneoplastic processes, even if his background is not specific to PEM. The extent to

which Dr. Shaw's testimony reflects an established medical understanding is one that can be

questioned on cross-examination but does not warrant wholesale exclusion.

Finally, Monsanto characterizes Dr. Shaw's conclusion that NHL caused PEM as "*ipse dixit.*"

(Mot. Exclude, Dkt. 110, at 9 ("Dr. Shaw offers nothing more than his *ipse dixit* assertion that a

history of NHL generally can cause PEM . . . .")). Dr. Shaw's causation opinion is only *ipse dixit*

because paraneoplastic processes have an exclusive mechanistic link to cancer. Put another way,

paraneoplastic processes are, by definition, caused by cancer. If Dr. Shaw's connection between

these two conditions is *ipse dixit*, that is because the connection is obvious, not because it is

unreliable.

### b. Dr. Freeman

In a similar vein, Monsanto takes aim at Dr. Freeman's assertion that Koen's PEM caused

his NHL. (Mot. Exclude, Dkt. 111, at 10–11 ("Dr. Freeman offers nothing more than his *ipse dixit*

opinion that a history of NHL generally can cause PEM.")). As with their other motions to exclude,

Monsanto accuses Dr. Freeman of relying on insufficient data. (*Id.*). Again, extensive research is not

needed to render an opinion on fundamental mechanistic causes, including the definitional link

between paraneoplastic processes and cancer. Like Dr. Shaw's testimony, Dr. Freeman's conclusion

is only *ipse dixit* because his opinion necessarily follows from Koen's diagnoses: Koen had NHL, a

type of cancer, and then had PEM, a disease caused only by cancer. Dr. Freeman may reasonably

conclude that Koen's NHL caused his PEM and does not need to conduct additional medical

research to reliably come to that conclusion.

Monsanto argues that Dr. Freeman fails to establish a specific link between PEM and NHL.

(Mot. Exclude, Dkt. 111, at 10). As the Court has explained above, the link is apparent: Koen had

cancer and then developed a paraneoplastic condition, which is caused exclusively by cancer. Dr.

Freeman does not need to have studied the specific link between the two subtypes of diseases to

render a reliable medical opinion. Such a level of specialization goes to "the weight of the evidence, rather than its admissibility." *Wen Chyu Liu*, 716 F.3d at 168.

### 4. Drs. Shaw and Freeman Do Not Improperly Parrot Others

Finally, Monsanto seeks to exclude Drs. Shaw and Freeman on the basis that they merely parrot the conclusions of Koen's treating physicians and pathologists. (Mot. Exclude, Dkt. 110, at 14–16). Here, Drs. Shaw and Freeman are testifying as retained expert physicians who have reviewed extensive medical records of Koen, including the conclusions rendered by his physicians and post-mortem pathologists. Some level of "parroting" is permissible, as physicians will presumably reach the same opinion when confronted with the same medical records.

It is the role of a retained expert physician to examine a patient's medical files and reach a conclusion about the diagnosis. There is nothing inherently unreliable about this method. To hold otherwise would be to exclude retained expert physicians as a category. A qualified physician reviews medical records and conclusions from other physicians, and then draws their own opinion from those records and conclusions. Drs. Shaw and Freeman did just that. Monsanto contends that they relied too heavily on the physicians' reports and excluded other potential contributing causes, but that does not affect their reliability. Physicians may, in their judgment, emphasize certain reports and records over others, and those discretionary decisions are far better assessed during cross-examination than in a motion to exclude.

### 5. Drs. Shaw and Freeman Used a Reliable Methodology

Monsanto next suggests that the retained physicians "did not apply any methodology, let alone a reliable one, in rendering [their] causation opinions." (Mot. Exclude, Dkt. 110, at 10). Monsanto faults both doctors for failing to cite any pathologic evidence of Koen's cancer returning and for failing to consider other alternatives to his neurological decline and death. (Mot. Exclude, Dkt. 111, at 14–16; Mot. Exclude, Dkt. 110, at 10–14).

The Court first addresses the "alternative causes" issue. Monsanto contends that in order for Dr. Shaw's and Freeman's diagnoses to be reliable, they should have been generated by "determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." (Mot. Exclude, Dkt. 110, at 12 (quoting *Johnson v. Arkema, Inc.*, 684 F.3d 452, 468 (5th Cir. 2012))). Here, Drs. Shaw and Freeman relied on Dr. Deisch's autopsy report, which found that Koen likely had PEM caused by his NHL but also noted that additional antigen testing could be done on Koen's cerebrospinal fluid to identify the "causative antibody." (Deisch Autopsy Report, Dkt. 110-1, at 80).

Once again, Monsanto's motion collapses into the merits of the trial. If PEM is caused by cancer, then it would be unnecessary for the physicians to expend time ruling out other potential alternative causes. Additionally, as a strict rule, *Daubert* does not require an expert to rule out alternative explanations. "[E]limination of alternative possibilities is one method of arriving at a result reliably, but it is not the only method." *Jackson v. Parker-Hannifin Corp.*, 645 F. Supp. 3d 577, 589 (S.D. Miss. 2022) (citing *Chisesi Bros. Meat Packing Co. v. Westchester Surplus Lines Ins.*, Civ. 2010 WL 3720465, at *4 (E.D. La. Sep. 9, 2010) ("[F]ailure to eliminate other possible causes may undercut the strength of his opinion, it does not affect the admissibility of that opinion.")). Koen had cancer and two years later was found to have likely died with a paraneoplastic process.[7]

---

[7] Monsanto suggests that other factors could have caused Mr. Koen's neurological condition, including "genetic disorders, congenital abnormalities, disorders, infections, diseases, comorbidities, etc." (Mot. Exclude, Dkt. 110, at 13). This suggestion appears to be purely speculative, and Monsanto does not set forth scientific research or evidence in its motion to suggest these factors cause PEM, which, again, is a disease caused by cancer. Nor does this, as Monsanto claims, flip the burden on Monsanto to disprove reliability. (*See* Reply, Dkt. 135, at 5). Plaintiffs showed that Dr. Shaw's testimony was reliable and that alternative conditions were not plausible causes. Monsanto cannot simply raise the specter of other alternative causes and then suggest that Plaintiffs' justification is incorrect. Plaintiffs met their preponderance burden as to alternative causes, and Monsanto fails to materially dispute that showing.

Ordinarily, an expert diagnosis may rule out alternative causes, but that is not the case here, where the mechanistic link is clear.

Nor will the Court exclude Drs. Shaw or Freeman's testimony because they fail to cite pathologic evidence that Koen's NHL recurred. This argument goes to a central merits question of the case: can PEM appear after a cancer has gone into remission? Plaintiffs contend that paraneoplastic processes do appear in patients after their cancer has gone into remission, while Monsanto appears poised to argue that Koen's NHL was in remission and therefore could not have caused his PEM. (*Compare* Mot. Exclude, Dkt. 110, *with* Resp., Dkt. 131). In his deposition, Dr. Shaw opined that the basis of his opinion that a paraneoplastic process continues after the treatment of cancer was that it is a "well-founded sort of background medical knowledge." (Shaw Dep., Dkt. 131-2, at 99). Dr. Shaw may rely on his background, training, and experience as a clinical pathologist to render that opinion. Both Dr. Shaw and Dr. Freeman appear to believe it is obvious and well-known that a paraneoplastic process can appear after a cancer has gone into remission, an opinion they have gained from their medical backgrounds. Monsanto's objection to this conclusion raises a question of fact, not of reliability. If Monsanto disputes that PEM may occur after remission, then Monsanto may introduce its own experts to that effect.

### F. Motion for Partial Summary Judgment

Monsanto's motion for partial summary judgment rests on exclusion of Plaintiffs' expert witnesses. (Mot. Summ. J., Dkt. 112, at 2 ("As explained in Monsanto's contemporaneously filed motions to exclude Plaintiffs' causation experts, Plaintiffs have no admissible expert evidence of causation as to Koen's neurological condition and death.")). As the Court finds Plaintiffs' medical expert witness testimony admissible, it will dismiss as moot the motion for partial summary judgment.

### G. Plaintiffs' Motions to Exclude

Having addressed Monsanto's motions, the Court turns to Plaintiffs' motions to exclude, Plaintiffs' motion for summary judgment, and Monsanto's motion to strike Plaintiffs' motions. Because the Court finds that Monsanto's motion to strike is warranted, it does not reach the merits of Plaintiffs' motions.

As background, Plaintiffs filed this lawsuit over four years ago, and it was consolidated with the third wave of cases in the *In Re Roundup* MDL. *In Re Roundup*, No. 3:16-md-02741-VC (N.D. Cal. Oct. 4, 2016). The presiding MDL judge entered a scheduling order which required Plaintiffs' *Daubert* motions and any motions for summary judgment to be due on October 6, 2021. (*See* Mot. Strike, Dkt. 122, at 2–3). The MDL judge remanded the case to this Court on February 25, 2022. (Suggestion of Remand, Dkt. 36). After remand, and shortly before this case was set to go to trial, Koen passed away. The parties then agreed to a modified scheduling order, which allowed the parties to seek "additional expert discovery limited to Koen's alleged neurological conditions and his alleged cause of death[.]" (Scheduling Order, Dkt. 84, at 2). The scheduling order noted that *Daubert* motions "shall be on new experts and reports only" and dispositive motions should be limited to "Koen's alleged neurological conditions, his alleged cause of death, and any claims that flow from his death. . . . All other dispositive motions are completed." (*Id.* at 1–2).

Plaintiffs' motions to exclude exceed the scope of the scheduling order. Plaintiffs' Motion to Exclude Certain Opinions of Dr. Silberstein seeks to preclude Monsanto's expert "from offering testimony comparing glyphosate usage and NHL incidence rate . . . ." (Dkt. 113, at 4). That is a causation opinion which could have been timely raised in the MDL proceedings but does not relate to the limited post-MDL discovery regarding Koen's death. Plaintiffs also seek to exclude Dr. Daly from testifying about medical factors which may have caused Koen's NHL or other environmental risk factors. (Dkt. 114, at 2–4). Again, this goes beyond the scope of re-opened discovery. Plaintiffs

seek to exclude Dr. Slack from comparing glyphosate usage and lymphoma incidence, which similarly relates to a question addressed in the MDL. (Dkt. 115, at 2–4). Finally, Plaintiffs move to exclude Dr. Creech from testifying about Roundup safety, which is similarly a topic for the MDL. (Dkt. 116, at 1–4). In sum, each motion to exclude relates to the link between Roundup and NHL, not the link between NHL and Koen's death. Accordingly, they should have been raised by the 2021 MDL deadline and are untimely.[8]

The same is true for Plaintiffs' summary judgment motion. (Mot. Summ. J., Dkt. 117). There, Plaintiffs seek summary judgment on (a) negligent conduct of parties not under Monsanto's control; (b) contributory negligence of Koen or Plaintiffs; (c) improper use of products; (d) failure to mitigate damages; and (e) preexisting conditions. (*Id.*). All of these defenses relate to Koen's use of Roundup and whether it caused his NHL, not whether his NHL (or other Roundup-induced conditions) caused his death. Accordingly, the summary judgment motion is likewise time-barred.

Plaintiffs next suggest that the Court should allow their motions to exclude as a discretionary scheduling matter. (*Id.* at 2). Courts may allow late modifications to a scheduling order if a party demonstrates "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). This standard requires a court to evaluate "the danger of prejudice to the [non-movant], the length of the delay and its potential impact on the judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Ikerd v. Berkshire Hathaway Homestate Ins.,* No. CV 23-1330, 2023 WL 8282011, at *2 (E.D. La. Nov. 30, 2023) (quoting *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 162 n.8 (5th Cir. 1980)).

---

[8] As to Dr. Slack and Dr. Silberstein, Plaintiffs contend the motions are timely because those two experts provided updated depositions. (Resp., Dkt. 145, at 1). However, it is not clear from Plaintiffs' response that the two experts raised new material in their report. Nor do Plaintiffs appear to seek to exclude only the updated portions of the report. Assuming that some portion of their report was in fact updated, Plaintiffs may file renewed motions that seek to exclude those portions of the report.

Plaintiffs have not demonstrated excusable neglect. Plaintiffs' motions are more than two years late and relate to discovery issues that were litigated extensively in the MDL proceedings. While, in some cases, courts may sanction a days, week, or even months-long delay, a party may not show "excusable neglect" for a two-year delay. This wait alone refutes Plaintiffs' good cause argument.

The remaining factors do not weigh in Plaintiffs' favor either. Monsanto will suffer prejudice from having to litigate the *Daubert* motions in this Court, rather than as part of the MDL designed to specifically address these causation issues. It would also harm judicial efficiency by risking conflicting decisions and defeating the purpose of MDL proceedings, which is to have complex pretrial discovery matters efficiently and uniformly decided by one judge. *See In re Ford Motor Co. Crown Victoria Police Interceptor Prod. Liab. Lit.*, 229 F. Supp. 2d 1377, 1378 (J.P.M.L. 2002) ("Centralization under Section 1407 is thus necessary in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings . . . and conserve the resources of the parties, their counsel and the judiciary."). The timing was in Plaintiffs' control, as they could have timely raised the same issues in the MDL. Finally, while there is no evidence of bad faith, Plaintiffs fail to explain why they did not raise these motions in the MDL. Accordingly, Plaintiffs have not shown good cause.

Plaintiffs raise two final arguments. First, Plaintiffs suggest that the Court has an inherent gatekeeping function and must therefore independently decide whether testimony is relevant and reliable. (Resp., Dkt. 145, at 2–3 (citing *First Assembly of God Church v. Fondren*, 2003 WL 25685226, at *5 (E.D. Tex. 2003))). That gatekeeping authority, however, does not act as a complete workaround for untimely motions—to hold otherwise would be to effectively render *Daubert* motion deadlines meaningless.

Second, Plaintiffs note that on January 30, 2024, the presiding MDL judge issued a ruling that excluded the opinion of Dr. Slack as it relates to the incidence of NHL and Roundup use in the general population. *In Re: Roundup*, (Pretrial Order No. 289, Dkt. 17841, at 15–16. Again, however, the Court cannot reach the merits of Plaintiffs' motions if they are untimely as a threshold matter. At this stage, the time for Plaintiffs to exclude Dr. Slack's study through a *Daubert* motion or motion in limine has passed.

## IV. CONCLUSION

For the reasons set forth in this order, Monsanto's motion to exclude Dr. Stan Smith, (Dkt. 106), is **GRANTED**. Monsanto's remaining motions to exclude, (Dkts. 107, 108, 109, 110, 111), are **DENIED**. Monsanto's motion for summary judgment, (Dkt. 112), is **DISMISSED AS MOOT**.

Monsanto's motion to strike, (Dkt. 122), is **GRANTED**. Plaintiffs' motions to exclude, (Dkts. 113, 114, 115, 116), and motion for summary judgment, (Dkt. 117), are **STRICKEN**.

**SIGNED** on June 11, 2024.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE